### APPEAL OF GEORGIA MANUFACTURING CO.

Docket No. 1718. Promulgated December 22, 1926.

1. The petitioner was incorporated on October 26, 1915, to take over the assets and business of an existing partnership. On the same date the partners agreed to turn over all the assets of the partnership in exchange for all the authorized capital stock of the corporation. The corporation carried on the business from that date. Real estate was transferred to the corporation by a deed dated January 29, 1916. *Held*, that for the purpose of computing the invested capital the assets should be valued as of October 26, 1915.

2. The plant account shown upon the books of the predecessor business at the date of incorporation stood at $120,000. The total assets of the partnership, including a surplus of approximately $100,000, were transferred to the corporation in exchange for capital stock of $120,000. The corporation assumed the liabilities of the partnership. The actual cash value of the assets transferred was in excess of the sum of the capital stock, the surplus, and liabilities of the business taken over. *Held*, that the petitioner is entitled to a paid-in surplus in the computation of invested capital, in addition to that shown on the partnership books of account, of the excess of the actual cash value of the assets over the sum of the par value of the stock, the surplus, and the liabilities shown on the books of account of the business at the date of transfer.

*J. R. Sherrod, Esq.*, and *W. A. Southerland, Esq.*, for the petitioner.
*F. O. Graves, Esq.*, *E. C. Lake, Esq.*, and *A. H. Fast, Esq.*, for the Commissioner.

This is an appeal from the determination of a deficiency in income and profits tax for the fiscal year ended September 30, 1917, in the amount of $3,208.85.

The Commissioner refused to allow a deduction for depreciation in excess of an amount based on the book value of depreciable assets, and held that the petitioner was not entitled, for invested. capital purposes, to a paid-in surplus which the petitioner had claimed in the amount of $318,453.95.

### FINDINGS OF FACT.

1. The petitioner is a Georgia corporation with its principal office at Whitehall, and is engaged in the manufacture of cotton yarns. It was incorporated on October 26, 1915.

2. The business was originally started in 1829. In 1834 it was acquired by ancestors of the present owners and has since been owned by the same family. About 1893 or 1894 the mill was burned and was soon replaced and has been in continuous operation since that time. The business was first incorporated in 1881 under a twenty-year limited charter, which was allowed to expire in 1902, but the business was continued without change of ownership.

3. The property and plant had stood on the books for an indefinite period prior to 1915 at a figure of $120,000. There had been additions to the mill and other property since 1894, the mill having been increased from a capacity of approximately 8,300 spindles by about 3,300 spindles. In 1904 the dam in the river was heightened and thickened.

4. The charter of the present corporation was granted on August 6, 1915. On August 26, 1915, the incorporators met, accepted the charter, organized, elected officers, and subscribed for the entire authorized issue of capital stock ($120,000), and agreed to pay therefor "the sum of $100 per share, to be paid in property to be taken at fair valuation, to wit: our respective interests in the property known now as The Georgia Manufacturing Company." The subscribers to the capital stock were the heirs of James White, John R. White, a brother, and two sisters of James White. On January 29, 1916, these parties had another meeting and formally tendered to the corporation a deed conveying to it the property hereinafter described. The entire capital stock was issued in exchange for all property, real and personal. The corporation conducted the business from October 26, 1915, just as though the entire property had been formally conveyed to it on that date.

5. The mill is located on the north bank of the North Oconee River, at Whitehall, Ga., about five miles southeast of Athens. The property conveyed to the corporation by the incorporators consisted of 467 acres of land lying on both sides and extending under the river, including water rights, with all improvements thereon, including dam, race, mill and factory building, and all machinery and equipment, warehouse, boiler house, etc., a group of farm buildings, a store, church, grist mill, school, and 63 cottages.

6. Of the 467 acres of land approximately 55 per cent was timbered and 45 per cent was cleared. The value of this land in October, 1915, and January, 1916, was $35 per acre, or $16,345. The dam, located about one-fourth or one-half mile above the mill, was built of massive rubble stone, 330 feet long, 14 feet high, and 3 foot crest and plank apron on upstream side, including also rubble masonry abutment walls. The canal was 2,100 feet long, with vertical face 8 feet high lined with rubble stone masonry walls. The factory building was of two stories, 55 by 386 feet, with rubble stone foundations varying from 5 feet to 25 feet deep, brick walls 24 inches, 16 inches, and 12 inches thick, and tar and gravel roof.

7. The railroad station at Whitehall was approximately three-fourths of a mile from the mill. Some raw cotton used by the mill was purchased in the town of Athens and hauled by truck to the mill. A quantity of cotton was also purchased from farmers who delivered it at the mill. The location on the river is favorable on account of the humidity necessary in the manufacture of yarn. The labor is a good class of native white help.

8. About 550 horsepower was required to operate the mill in 1915; 8,300 spindles being operated with 400 horsepower developed water power, and the remainder being operated by 150 horsepower of purchased hydro-electric power. The water power was not fully developed and used. The hydro-electric power was purchased from John R. White, who owned a mill farther down the same stream, which was generating more power than it needed. John R. White was also president and general manager and owner of a large interest in the petitioner. The hydro-electric power purchased was not metered and the charge made to the petitioner was less than the market price for the power. Since 1915 the petitioner has developed an additional 150 horsepower from the available water power by simply adding new runners on the water wheel and by putting in a small generator.

9. There has never been any attempt to sell the property, no stock of the corporation was ever sold to outsiders, and none was sold for cash around 1915.

10. The property had been kept in good repair prior to 1915 and the mill was running at 90 per cent of theoretical production in 1914, 1915, and 1916.

11. The actual cash value of land, buildings, machinery and equipment carried on the books of account of the partnership at October 26, 1915, was as follows:

Land _____ $16, 345. 00
Buildings _____ 82, 741. 53
Machinery and equipment _____ 69, 476. 55

Total _____ 168, 563. 08

12. In 1925 the petitioner caused an appraisal to be made of the water power by a firm of engineers. The flow of the Oconee River, upon which the petitioner's mill is located, was taken at 40 per cent of the flow at the United States Geological Survey Gauging Station on the Oconee River, Georgia, about 25 miles below the junction of the North Oconee and Middle Oconee Rivers. On this basis the stream of the petitioner's mill was found capable of developing 550 horsepower for 10 hours, 312 days per year, 400 horsepower for 10 hours at night for 2.4 months in the year, with additional residual annual horsepower aggregating 5,130,700 horsepower. On October 26, 1915, the mill was actually using developed power of 400 horsepower for 10 hours, 312 days per year. The engineers classed this as class (1) power. The mill was also using 400 horsepower for 10 hours at night for an average of 2.4 months per year. This power was designated as class (2) power. One hundred fifty horsepower for 10 hours, 312 days in the year, which could have been developed with an expenditure of approximately $6,700, was classed as class 1-A power. These three classes of power, class (1), class 1-A, and class (2), designated as primary power, were assumed by the engineers to have a cash value on October 26, 1915, and also January 29, 1916, the date when the real estate was transferred to the petitioner, using the average cost of steam power and purchased hydro-electric power as a basis for comparison, as follows:

Class (1) power _____ $112, 611. 14
Class 1-A power _____ 39, 915. 71
Class (2) power (night) _____ 25, 557. 14

Total _____ 178, 083. 99

13. The value of class (3) power, referred to by the engineers, lay in converting it into hydro-electric power and selling it as " dump power " to the electric company in the town of Athens, at 3⅓ mills per K.W.H. Taking into consideration the development necessary to produce this power and the operating expenses, and designating the net expected profit from the sale of this class of power at 15 per cent, the engineers estimated that the cash value at October 26,

1915, and on January 29, 1916, was $35,816.87. The engineers therefore estimated the cash value at October 26, 1915, and January 29, 1916, of the water power acquired by the petitioner at $213,900.66.

14. Semi-annual statements of the condition of the petitioner at April 1 and October 1 of each of the years 1911 to 1915 were introduced in evidence. Statements of condition at April 1, 1911, and October 1, 1915, are as follows:

### April 1, 1911.

| | | | |
|---|---|---|---|
| Capital stock | $120,000.00 | Mill and machinery | $120,000.00 |
| Cash in bank | 96,768.00 | Surplus | 115,967.08 |
| Due from sundries | 13,548.02 | | |
| 45 bales cotton | 3,150.00 | | |
| In process of mfg | 3,775.00 | | |
| Stock in store | 500.00 | | |
| Yarn in mill | 255.00 | | |
| Waste | 223.84 | | |
| Cash in safe | 80.62 | Balance | 2,333.40 |
| | 238,300.48 | | 238,300.48 |

### October 1, 1915.

| | | | |
|---|---|---|---|
| Capital stock | $120,000.00 | Mill and machinery | $120,000.00 |
| Cash in bank | 68,262.67 | Surplus | 95,449.23 |
| Cotton on hand | 10,886.40 | Due sundries | 2,500.00 |
| Stock in process | 3,775.00 | | |
| Stock in store | 1,500.00 | | |
| Due from sundries | 13,766.76 | | |
| Machinery purchased | 1,200.00 | Balance | 1,441.60 |
| | 219,390.83 | | 219,390.83 |

Cash dividends of 12 per centum per annum were paid upon capital stock or capital shares aggregating $120,000 for the years 1911 to 1915, inclusive.

15. There are no books or records available prior to 1911. At the formation of the present corporation in 1915, the plant was placed on the books at a value of $120,000, no segregation being made as to the various classes of assets, which consisted of land, village buildings, mill buildings, machinery, and developed water-power site.

16. In the computation of deductible depreciation for the year ended September 30, 1917, the Commissioner has taken 8 per cent of the plant value as shown by the books of account, $120,000, and has allowed the deduction of $9,600 for depreciation. He has disallowed the deduction of depreciation of assets of an alleged value in excess of $120,000.

17. In computing the taxable net income for the fiscal year under review, the petitioner claimed deductions aggregating $1,929.50, representing expenditures for items of a capital nature, with respect to which deductions petitioner admits error.

OPINION.

SMITH: In its petition the petitioner alleges that the deficiency determined by the Commissioner is predicated upon the following errors:

(1) That the Commissioner has failed to include as part of the invested capital of the petitioner the actual cash value of the plant, properties, and water power acquired at the date of organization in excess of the par value of the stock issued therefor.

(2) That the Commissioner has failed to allow depreciation based upon the actual value of the depreciable assets at date of acquisition.

There was a subsidiary question raised at the hearing, namely, whether the assets should be valued as of the date of incorporation, October 26, 1915, or as of January 29, 1916, the date when the real property was deeded to the corporation.

The subsidiary question will be considered first. It is to be noted from the findings of fact that the incorporators, who were all of the persons who owned the assets of the partnership, subscribed for the entire capital stock on October 26, 1915, agreeing to pay therefor their interests in the business of the Georgia Manufacturing Co., the partnership. The corporation operated the business from the date of incorporation as though it had legal title to all of the assets of the partnership, including real estate. We therefore think that the corporation had equitable title from the date of incorporation and that, in a determination of the actual cash value of property paid in, the basic date for the determination of such value is October 26, 1915.

In this proceeding we have a situation where the petitioner was incorporated to take over a going business long before the enactment of any excess-profits tax law and under conditions which made it immaterial as to whether the authorized capital stock provided for in its charter was large or small. For years the business had been owned and conducted by one family group, and when it was incorporated it became a close family corporation. The head of the family and the owner of by far the largest interest in the business died in 1915. Among the heirs of the latter was one minor child. For the purposes of administering the estate and as a convenience in its distribution, the business was incorporated and its capital stock issued to the heirs. It was immaterial, so far as the parties at interest were concerned, whether their respective interests were to be evidenced by a single share or a greater number of shares of capital stock, so long as their respective interests were not disturbed. The relation of value of the assets paid in to the corporation to the total authorized capital stock at no time was seriously considered. For years the properties had been carried on the books at a value of

$120,000. When the petitioner came into being the same books of account were maintained without change and the properties continued to be carried at the same book value.

None of the capital stock of this petitioner was issued to outsiders; none was sold for cash in or about the year 1915. No offers to purchase the business and its properties had ever been received; there was no appraisal of the properties when acquired by this petitioner. Nothing else took place at or about the date of organization which would serve as a guiding light in an effort to determine the value of the properties at the basic date.

The taxing statute provides that there shall be included in the invested capital of a corporation:

(1) Actual cash paid in, (2) the actual cash value of tangible property paid in other than cash, for stock or shares in such corporation * * * at the time of such payment (but in case such tangible property was paid in prior to January first, nineteen hundred and fourteen, the actual cash value of such property as of January first, nineteen hundred and fourteen, but in no case to exceed the par value of the original stock or shares specifically issued therefor), and (3) paid in or earned surplus and undivided profits used or employed in the business, exclusive of undivided profits earned during the taxable year: * * * (Section 207(a), Revenue Act of 1917).

The question for consideration is " the actual cash value of tangible property paid in other than cash " for stock or shares in the corporation. This corporation was organized subsequent to January 1, 1914. Accordingly, the provisions relative to the valuation of the assets prescribed by the parenthetical language does not apply to this case. The actual excess cash value of the tangible property paid in constitutes paid-in surplus.

It was recognized by the incorporators that the par value of the capital stock of the corporation was no real index of the fair value of the assets paid in to the corporation for such capital stock.

In the resolution of the board of directors adopted on October 26, 1915, it was provided:

The capital stock of said corporation shall be ONE HUNDRED AND TWENTY THOUSAND ($120,000.00) DOLLARS with the privilege of increasing the same to the sum of FIVE HUNDRED THOUSAND ($500,000.00) DOLLARS by a majority vote of the stockholders. Said stock to be divided into shares of ONE HUNDRED ($100.00) DOLLARS each. More than 10% of the amount of capital to be employed by them has been actually paid in.

For the purpose of determining the actual cash value of the property as of October 26, 1915, the petitioner caused an appraisal to be made of its property in 1925 by a firm of appraisal engineers. These engineers made a careful inventory of all of the property of the corporation then on hand which was paid in to the corporation in exchange for its shares of stock, and added thereto the tangible assets

which had been discarded from the date of incorporation to the date that the appraisal was made. The inventory of these assets was carefully made. The engineers determined the reproduction cost of the assets and provided for liberal depreciation from the date of acquisition to the date of their acquisition by the partnership. A number of witnesses deposed as to the cost of construction of buildings, etc., in 1915, as to the condition of the buildings of the petitioner at the time of acquisition in 1915, and as to their estimates of the value of those properties. The appraisal was supplemented by oral testimony of the engineers who made the appraisal and who qualified as expert witnesses. The values are segregated in the appraisal as follows:

| Assets. | Reproduction cost. | Accrued depreciation. | Net. |
|---|---|---|---|
| 467 acres land | | | $16,345.00 |
| Buildings | $131,087.29 | $48,345.76 | 82,741.53 |
| Machinery and equipment | 125,856.70 | 56,380.15 | 69,476.55 |
| | | | 168,563.08 |

In the opinion of witnesses, including an officer of the corporation who had been with it and had been acquainted with the property since 1910, the valuations placed upon the assets by the appraisal engineers were extremely conservative. They gave it as their opinion, which we believe should be given great weight, that the actual cash value of the properties in 1915 was $168,563.08. The appraisal engineers did not attempt to value the water power. It was, however, valued by a different firm of engineers who specialized in making such valuations. The value arrived at in their appraisal has been determined by the " saving over coal and electricity method." The total value fixed by these engineers in their report is $213,900.66, and the petitioner asks that we accept this value for the purpose of determining the invested capital.

Although we have indicated in numerous decisions that the value of properties determined by retrospective appraisals upon the basis of cost of reproduction is of little value, standing alone and unsupported by other evidence, in determining the actual cash value of property at a given date, the estimates of value made by appraisal engineers fully qualified to express an opinion as to the actual cash value of the properties have some evidentiary value, and where, as in this case, they are supported by the testimony of witnesses who had a knowledge of the properties at the time paid in and for several years prior thereto, they are entitled to weight. The record of almost four hundred pages in this proceeding is replete with the story of the engineers who personally made the appraisal. It convinces us that the actual cash value of the land, buildings, machinery, and equip-

ment constituting a part of the assets paid in to the corporation for its shares of stock was in excess of the par value of those shares, and we are of the opinion that the actual cash value of such assets was at least $168,563.08, the amount claimed. We therefore think that the petitioner is entitled to a paid-in surplus, in the computation of its invested capital, of the difference between the par value of its capital stock and the above-named amount, or $48,503.08.

We are further convinced that the water power had some cash value in excess of the value of the land underlying it. We are not, however, convinced that the water power had an actual cash value of $213,900.66, as contended by the petitioner. Various courts and public service commissions have found that it is impracticable to value a water power on any such basis as that used by the engineers employed by the petitioner. In passing upon an application for a transfer of certain property, the New Hampshire Public Service Commission found such a valuation impracticable. (3 N. H. P. S. C. 174.) The Commission states, at pages 821–822:

> We feel that any attempt to establish a formula for determining the value of water power would prove as difficult as the establishment of a formula for fixing by mathematical process the exact value of an entire public utility plant.
>
> The original cost of the water power, the cost of developing the same, the cost of similar powers in substantially similar locations, the amount of actual earnings in the past, and estimated earnings in the future, are undoubtedly all proper matters for consideration. But when a water power is an integral part of a utility property it is unnecessary and not ordinarily desirable to endeavor to fix an exact value for the same considered apart from the other portions of the property to be valued. Evidence of the character indicated should be considered, but in the end it will ordinarily be best to fix a value upon the entire property to be appraised rather than to attempt to dissect it, and fix an exact value on all its several parts.

Also, in the petition of *Grafton County Electric Light & Power Co.*, (28 A. T. & T. Co. Com. L. 533, February 3, 1914) the New Hampshire Public Service Commission stated in part, in regard to the valuation of water power based upon a comparison of the cost of the energy produced by water with the cost of the same amount of power produced by the use of coal, as follows:

> We can not admit that there is any compulsory method of determining the value of a water power, or of any other part of the plant of a public utility, except the method of considering all the available evidence, and, exercising the best possible judgment in giving to each fact its due weight, determining, upon all the evidence, what that power is worth in the market. Its saving to the owner over some more expensive method of power production does not measure its selling price, or value, any more than the cost-of-reproduction method determines the value of physical structures, simply because, as a matter of fact, water powers are not valued and do not sell upon that basis. And the objection of the Supreme Court to the conjectural character of the cost-or-reproduction method applies with equal force to the "saving-over-coal" method

of valuing water powers. It assumes, what is not proved, that power could be produced profitably by coal. And it assumes, what is not true, that a given amount of power produced by water, varying in amount as it will on even the best regulated streams, is equal in value to a like amount of power generated by steam, constant and reliable at all times. Water power has value, if it produces energy at a sufficient saving over coal to offset the disadvantages attendant upon its variable production. But the entire saving over coal, calculated on the total annual production of power, and capitalized, certainly far exceeds the value of the power—what one would pay for it as a substitute for a steam plant.

The Board is unable to determine from the record the petitioner's invested capital, and, in the circumstances in the case, the petitioner is entitled to have its liability to excess-profits tax for the fiscal year ended September 30, 1917, computed under the provisions of section 210 of the Revenue Act of 1917. In this case, the determination of the Commissioner with respect to proper comparatives will be accepted by the Board in its final determination of tax liability.

The Commissioner has allowed the petitioner depreciation for the taxable year under review of $9,600. This was at the rate of 8 per cent on the Commissioner's valuation of $120,000 for all property, including the real estate. The petitioner contends that the depreciation should be computed upon the values placed upon the properties by the appraisers and allowed in the amount of $7,621.26 for the taxable year. We have carefully considered the values and rates contended for by the Commissioner and are of the opinion that the depreciation allowance should be in the amount of $7,621.26.

The petitioner erroneously deducted from gross income in its tax return the sum of $1,929.50, representing expenditures made during the taxable year for items of a capital nature. This amount should be restored to the taxable net income and any resulting deficiency shown to be due should be assessed accordingly.

*Judgment will be entered on 15 days' notice, under Rule 50.*